ESTATE OF HARRIETT L. FEUCHTER, DECEASED, MARGARET L. HANNAH, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feuchter v. Commissioner
Docket No. 1553-90
United States Tax Court
T.C. Memo 1992-97; 1992 Tax Ct. Memo LEXIS 109; 63 T.C.M. (CCH) 2104; T.C.M. (RIA) 92097; February 18, 1992, Filed *109 Decision will be entered under Rule 155. David L. Higgs and Wilson C. Washkuhn, for petitioner. Darrell C. Weaver, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined a deficiency in decedent's Federal estate tax in the amount of $ 400,450 and an addition to tax under section 6660 in the amount of $ 120,135. *110 The deficiency was due to an alleged undervaluation of decedent's interest in a land trust partnership. After concessions, the issues for decision are: (1) The fair market value on August 27, 1986, of decedent's interest in a land trust partnership. The partnership owned six tracts of land. Petitioner claims the value of decedent's interest in the partnership was $ 364,551; respondent contends it was $ 1,350,107. (2) Whether petitioner is entitled to a discount for the portion of the six tracts of land held as an undivided one-half interest. We hold that petitioner is entitled to this discount. We conclude that the value of decedent's interest in the partnership is $ 454,537. (3) Whether petitioner is liable for an addition to tax for underpayment of tax attributable *111 to a valuation understatement under section 6660. We hold that petitioner is not liable for an addition to tax under section 6660. Respondent concedes issues relating to the death tax credit and estate tax interest. References to decedent are to Harriett L. Feuchter. References to petitioner or to the Estate are to the Estate of Harriett L. Feuchter. References to the executor are to Margaret L. Hannah, executor of decedent's Estate. Section references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Decedent and Decedent's Estate
At the time of her death on February 27, 1986, decedent resided in Peoria County, Illinois. Her Estate is being administered in Illinois. The executor of the Estate, Margaret L. Hannah, is decedent's daughter. She resided in Peoria, Illinois, when the petition was filed. The executor timely filed a United States estate tax return for the Estate of Harriet L. Feuchter. Petitioner elected to value the gross Estate as of August 27, 1986 (the *112 valuation date), pursuant to section 2032. 2. Feuchter Enterprises Land Trust/Partnership
Feuchter Enterprises Land Trust/Partnership (the partnership) was created on December 1, 1977, to keep the real property held by the partnership in the Feuchter family. Ownership of the partnership was represented by 680 shares of stock. Decedent owned all shares of the partnership at its creation and later transferred certain shares to members of her immediate family. At her death, decedent owned 388.5 shares (57.13 percent) of the 680 shares. The partners in the partnership are decedent's daughters and their spouses, and decedent's seven grandchildren, each of whom executed the partnership agreement. At decedent's death, the partnership owned eight tracts of real property, all located near Peoria. Six of the tracts are at issue here. Around 1980, some of the land was involved in eminent domain proceedings with the State of Illinois. The State wished to condemn portions of the property to extend Highway 6, also known as Interstate 474 and Route 405. 3. The Six Tracts of Real Estate
Decedent's family has owned and farmed the six tracts of land for four generations. *113 At the time of trial, one of decedent's daughters, son-in-law, and grandson farmed the land pursuant to a lease arrangement with the partnership, and they intended to continue doing so. Various improvements were present on the tracts. a. Tract I
Tract I has approximately 80 acres, 35 of which were being used on the valuation date to grow corn, beans, and wheat. The balance was timberland and bluff. The tract is bounded on the north by a residential area and Mossville Road, on the east by Highway 6, and on the west by the city limits of Peoria. West of Tract I within the city limits of Peoria is park land owned by the City of Peoria. Access to Tract I is via Mossville Road. Portions of the parcel are accessible only by crossing a creek which runs through it. The south 1,382 feet of Tract I is zoned for agricultural use. The remainder of the tract to the north and extending to Mossville Road is zoned for residential use. On the valuation date, the partnership owned an undivided one-half interest in Tract I. b. Tract II
Tract II has approximately 119 acres, 20 of which were being used on the valuation date to grow corn, beans, and wheat. The balance was *114 timberland and bluff. The tract is bounded on the south by residential and church property, on the west by the city limits of Peoria and Robinson Park, a city park, and on the east by a blacktop road that parallels Highway 6. Tract II is adjacent to Highway 6 but is not directly accessible from it. On the south, Tract II is accessible by a road which enters the property from Mossville Road. Tract II is zoned for agricultural use for that part in Section 27 and residential use for that part in Section 28. On the valuation date, the partnership owned an undivided one-half interest in Tract II. c. Tract III
Tract III has approximately 14 acres, all of which were being used to grow corn, beans, and wheat on the valuation date. Tract III is bounded on the west by Highway 6 and on the east by Galena Road, also called State Street. Access to Highway 6 is via Galena Road. Tract III is zoned for industrial use. On the valuation date, the partnership owned an undivided one-half interest in Tract III. d. Tract IV
Tract IV has approximately 139 acres, 80 of which were tillable and on the valuation date were being used to grow corn, beans, and wheat. The nontillable *115 portion is wooded hillside on an Illinois River bluff. Tract IV is bounded on the west by the City of Peoria and a Boy Scout camp. It is bounded on the east by the right-of-way of Highway 6. Access to Tract IV is by Boy Scout Road along the length of the northern boundary of the tract. Tract IV is zoned for agricultural use. e. Tract V
Tract V has approximately 44.5 acres. It is all tillable and was being used to grow corn, beans, and wheat on the valuation date. Tract V is bounded on the north by Boy Scout Road and on the east by Galena Road. Caterpillar Tractor Company owns land across the entire northern and eastern boundary of Tract V. Tract V is separated from Tract IV on the west by the right-of-way of Highway 6, which had not been constructed as of the valuation date. Access to Tract V is via Galena Road. Tract V is zoned for industrial use. f. Tract VI
Tract VI has approximately 20 acres, all of which is tillable and which was being used to grow corn, beans, and wheat on the valuation date. Tract VI is bounded on the south by Boy Scout Road. Caterpillar Tractor Co. owns land to the east and north of Tract VI. Access to Tract VI is via Boy Scout *116 Road. Tract VI is zoned for agricultural use. 4. Peoria Area,Economy, and Real Estate Market
All six tracts are located in the Medina Township of Peoria County, Illinois. The Township does not provide garbage collection or sewers to its residents. Peoria County provides police and fire protection to Medina Township residents. The City of Peoria is adjacent to the Township. In 1980, Peoria's population was approximately 124,000. It has an economic base in agriculture, mining, manufacturing, and service industries. Medina Township owns the Medina Wall, a 30-foot-wide strip of land in Medina Township which borders the City of Peoria. The wall was created by Township landowners in an attempt to keep property in the Township from being annexed by the City of Peoria. Highway 6 is located in the area and is currently in the process of being extended. Highway 6 ends approximately at the north end of Tract II and divides Tracts II and III. If completed, the road would divide Tracts IV and V. Caterpillar Tractor Co. (Caterpillar) is the area's largest employer. Caterpillar owns hundreds of acres in the area, about half of which are developed. Mossville Industrial *117 Park is an industrial park started in 1979 or 1980. It is located adjacent to both Tract V and to Caterpillar. Since 1979 or 1980, 1 of its 14 available lots has been sold. Around the end of 1979, Peoria began to experience adverse economic conditions which lasted for about 6 years and which were marked by a substantial decrease in employment in the industrial base. During this time, Caterpillar experienced financial losses, reduced local employment levels, and two major United Auto Workers strikes. Also during this time, another Peoria employer, the Pabst Brewing Company, closed completely. The economic situation during this 6-year period resulted in dramatically reduced numbers of single family home sales and a more than 50-percent reduction in Peoria Board of Realtors membership. As of August 1986, there was virtually no residential development taking place in the Peoria area. Peoria's economic situation began to improve during 1986. The following is the number of new residential building permits issued for each year between 1978 and 1990, for single family dwellings, in Peoria: Year
Number of Permits Issued
1978
274
1979
145
1980
57
1981
34
1982
20
1983
26
1984
30
1985
13
1986
42
1987
132
1988
192
1989
206
1990
174
*118 Many of the recently successful residential developments in the Peoria area are in the "North Knoxville Corridor". The North Knoxville Corridor refers to the area easily accessed by Knoxville Avenue, extending north through the Peoria city limits to Cedar Hills Drive. After 1986, as the real estate market improved, the first development efforts were within this area. Of the six tracts at issue here, none are easily accessed from the North Knoxville Corridor. The most popular site for a home in Peoria, Illinois, is a site with a view of the Illinois River. The next most popular is a wooded site with a valley view. OPINION 1. Value of Property
The first issue for decision is the fair market value on August 27, 1986, of decedent's interest in the partnership. We must first decide the fair market value of the six tracts of land. a. Expert Witnesses
The opinions of expert witnesses are admissible and relevant to the issue of value, but the opinions are weighed according to the experts' qualifications and other relevant evidence. See , affg. ; ; *119 . We may find one expert more persuasive on one element of valuation and another more persuasive on another element. . Consequently, we may accept or reject expert testimony in accordance with our own judgment, , and we may be selective in determining what portions of an expert's opinion, if any, we will accept. . There were three expert witness appraisers at the trial: Gregory D. Stone, for respondent, and John D. Spangler and James W. Klopfenstein, for petitioner. Each valued the six tracts of land, as of August 27, 1986, as follows: [1]Appraiser  Stone
Spangler
Klopfenstein
Tract I
$ 488,000
$ 80,000
$ 96,000
(80 acres)
Tract II
725,000
74,375
84,000
(119 acres)
Tract III
140,000
15,050
21,000
(14 acres)
Tract IV
850,000
128,575
167,000
(139 acres)
Tract V
355,000
85,100
89,000
(44.5 acres)
Tract VI
160,000
18,000
20,000
(20 acres)
TOTAL     $ 2,718,000
$ 401,100
$ 477,000
*120 In addition, Dale A. Jorgenson testified for petitioner concerning the viability of the six tracts for residential development. (1) Gregory D. Stone
Gregory D. Stone, respondent's expert, appraised the six tracts in 1989 pursuant to respondent's request. Mr. Stone received a bachelor of science degree from Western Illinois University. He has taken several appraisal-related courses with the American Institute of Real Estate Appraisers and the Society of Industrial Realtors. He taught courses in finance and investment and a broker's course at Illinois Central College for 3 years. Mr. Stone has been a real estate broker for 15 years. He is a member of the National Board of Realtors and the Building *121 Operators and Managers Association and a candidate for the American Institute of Real Estate Appraisers and the Society of Industrial Realtors. Mr. Stone believes that, although the property was being used as farmland as of the valuation date, it had a higher and better use as either residential or commercial and industrial property. He believes that the highest and best use of Tracts I, II, IV, and VI is low- density, high-quality residential development, and that the highest and best use of Tracts III and V is low-density, high-quality commercial and industrial highway-orientated development. Mr. Stone believes that a majority of the property west of the Highway 6 extension could be developed with wooded river view sites and some valley sites that would be in high demand.
Mr. Stone used the market data approach to value the property. He considered sales he believed to be comparable and made adjustments for differences in quality, location, size, services, and market appeal. He located sales of "transitional" property -- property that was purchased and then used, either immediately or ultimately, for a higher use. Mr. Stone based his assessment on 20 comparables. The comparables *122 range in value from $ 2,900 to $ 17,900 per acre, with typical values between $ 4,000 and $ 6,500 per acre. (2) JOHN D. SPANGLER John D. Spangler, petitioner's witness, appraised the six tracts in July 1986, in connection with the filing of decedent's Federal estate tax return. He supplemented his appraisal in September 1986.
Mr. Spangler graduated from the University of Illinois in 1950 with a major in agricultural economics. He retired in 1986 as president of the Federal Land Bank Association of Bloomington-Eureka after working for the Federal Land Bank System since 1950. During his career, he made thousands of appraisals of farmland for loan purposes and supervised other appraisers and loan officers. Since his retirement, he has continued to do appraisal work. Mr. Spangler is a member of the American Society of Farm Managers and Rural Appraisers and its State chapter, the Illinois Society of Professional Farm Managers and Rural Appraisers. Mr. Spangler used a market data approach to value the property. In his assessment, he considered the value of the property as farmland and whether residential or commercial development was possible. Mr. Spangler based his assessment *123 on eight comparables ranging in value from $ 575 to $ 1,800 per acre, with typical values between $ 1,100 and $ 1,800 per acre. Mr. Spangler believes that the Highway 6 extension decreased the tracts' value as farmland because, by segmenting the tracts, the extension has made them impossible to farm economically with modern farm machinery. He also said that, given the condition of the area real estate market in the fall of 1986, the tracts had very little value for residential, recreational, or industrial purposes. In his testimony, Mr. Spangler demonstrated great depth of knowledge of Peoria-area land values and expertise as an appraiser. (3) JAMES W. KLOPFENSTEIN James W. Klopfenstein appraised the six tracts in 1990, pursuant to the request of petitioner's attorney. Mr. Klopfenstein received a bachelor of arts degree in business administration from Bradley University. He has taken appraisal courses with the Society of Real Estate Appraisers and has attended various appraisal seminars. Throughout his appraising career, which began in 1965, he has appraised residential, commercial, industrial, and rural properties. Mr. Klopfenstein is a member of the Society of Real *124 Estate Appraisers and the Pekin and Peoria boards of realtors. He holds professional designations with the Society of Real Estate Appraisers. Mr. Klopfenstein is the president of Morton Community Service Corp. Formerly, he worked as assistant vice president and staff appraiser for Morton Federal Savings & Loan Association.
Mr. Klopfenstein's expert report stated that the highest and best use of Tract III was transitional from agricultural to residential. However, the value he assigned to Tract III suggested he viewed it as having a highest and best use as agricultural, and he so testified at trial. We do not view his position as being at odds with that of Mr. Spangler on this point.
Based upon that opinion, Mr. Klopfenstein used the market data or comparable sales approach to valuing the property. He based his assessment on 16 comparable sales ranging in value from $ 320 to $ 2,000 per acre, with typical values between $ 1,100 and $ 1,700 per acre. (4) DALE A. JORGENSON Dale A. Jorgenson, petitioner's witness, inspected the six tracts pursuant to a request by petitioner's attorney.
Mr. Jorgenson received bachelor's and master's degrees from Missouri State University in *125 1972 and 1975. He has been active in the Peoria area real estate market since 1977 and obtained his broker's license in 1984.
Mr. Jorgenson has developed single family residential building lots in recent years. In the late 1980s, he developed more than 50 lots on approximately 120 acres of land. Mr. Jorgenson personally inspected the six tracts of land. He testified with regard to the suitability of the tracts for residential development as of August 1986. He stated that, even with the growth in recent years, no development has occurred in the area where the six tracts are located. He believes that, as of the valuation date, the six tracts offered virtually no potential for residential development. b. FAIR MARKET VALUE OF PROPERTY Section 2031(a) provides that the value of a decedent's gross Estate includes "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated". For purposes of section 2031(a), "value" means "fair market value" defined by section 20.2031-1b, Estate Tax Regs., as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy *126 or to sell and both having reasonable knowledge of relevant facts." Fair market value is a question of fact to be determined from the entire record. , affd. sub nom. . Valuation is an approximation derived from all the evidence. ; , affg. . While we must consider the entire record, we have broad discretion to decide what facts are most important in reaching a determination because "finding market value is, after all, something for judgment, experience and reason." , affg. a Memorandum Opinion of this Court dated Jan. 22, 1951. To decide the fair market value of the six tracts of land, we first decide the highest and best use of the land and then review sales of comparable property. (1) HIGHEST AND BEST USE The fair market value of property must reflect the highest and best use of that property on the relevant *127 valuation date. , affg. . On the valuation date, the tillable portion of each of the six tracts of land was being used as farmland. The fair market value of land, however, is not affected by whether it is actually used for its highest and best use. . "The realistic, objective potential uses for property control the valuation thereof." Id. In , a takings case, the U.S. Supreme Court stated: The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is * * * needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. Mr. Stone, respondent's expert, testified that the land's highest *128 and best use is either for residential or for commercial and industrial development, depending on the tract. Mr. Klopfenstein, one of petitioner's experts, testified that the highest and best use of the six tracts is for agricultural purposes. Petitioner's other expert, Mr. Spangler, did not believe it could be used for commercial or residential development. In deciding the highest and best use of the six tracts as of the valuation date, we consider the purpose for which the tracts are zoned and the potential to rezone the land for other purposes, the potential for residential or commercial development of the land, the effect of the highway extension on the land, and the condition of the Peoria economy and real estate market on the valuation date.
At the valuation date, the six tracts were zoned for a variety of purposes: agricultural, residential, and industrial. The land was not, in each case, used consistently with how it was zoned. For example, Tracts III and V were each zoned for industrial use but were being used for agricultural purposes. Mr. Spangler, petitioner's witness, testified that he believes it would be easy to rezone the land for a higher use because there was a *129 great need for economic development in the Peoria area in 1986. Considering the likelihood of obtaining different zoning for the land, we do not think that the zoning of a particular tract of land would have a significant impact on its value. Some of the land is potentially desirable for residential development. For example, 59 acres of Tract IV is wooded hillside on an Illinois River bluff. The most popular site for a home in Peoria, Illinois, is a site with a view of the Illinois River; the next most popular is a wooded site with a valley view. However, none of the six tracts are located within the North Knoxville Corridor -- the area in which many of the recently successful residential developments are located. Some of the land is also potentially desirable for commercial development. For example, Tracts V and VI are adjacent to land owned by Caterpillar, the area's largest employer. However, Caterpillar owns hundreds of acres in the area and has only developed approximately half of this land. In addition, Mossville Industrial Park, located adjacent to Tract V and Caterpillar, has been able to sell only 1 of its 14 developed industrial lots. As of the valuation date, the Peoria *130 economy was at the end of a severe, 6-year recession. The demand for residential building lots during this period was virtually nonexistent. Mr. Jorgenson, petitioner's expert, testified that, as of the valuation date, the six tracts had virtually no potential for residential development. While in better economic times the highest and best use for the six tracts may have been for residential or commercial and industrial use, in August of 1986 the property was not needed or likely to be needed for such purposes in the foreseeable future. Accordingly, although respondent's expert thought that the highest and best use of the tracts was transitional, we find that the highest and best use of the six tracts of land on the valuation date was for agricultural purposes. (2) COMPARABLE SALES Generally, sales of comparable properties represent the best evidence of the fair market value of real estate, and a sale of the subject property itself proximate in time to the relevant valuation date is the best evidence of fair market value. ; sec. 20.2031-1(b), Estate Tax Regs. While subsequent events are generally *131 not relevant in fixing a property's fair market value on a given date, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value except where a material change in circumstances occurs between the valuation date and the date of sale which renders the subsequent sale unforeseeable. ; accord . Hindsight cannot, however, be the only evidence relied on. . Mr. Stone, respondent's expert, valued the property on the assumption that its highest and best use was either as residential or commercial and industrial property. We find two flaws with the comparable sales on which he has based his appraisal. First, most involve property which was purchased and used for a higher purpose than as farmland. Second, most of the sales which Mr. Stone considers took place between 7 and 10 years before the valuation date. These sales predated the serious decline in the Peoria economy from 1980 to 1986. For these reasons, we give little weight *132 to Mr. Stone's estimates. We have considered the 1980 sale of land to the State of Illinois for $ 4,313 because it is located very close to the property at issue, but we give it less weight because the sale occurred 6 years prior to the valuation date. In 1987, Mr. Jorgenson paid $ 4,300 to $ 4,400 per acre for the land for the Townsend Subdivision in Peoria, which he developed that same year. However, this land was worth more per acre than the tracts at issue for several reasons. When Mr. Jorgenson purchased the land, it had already been platted and approved for development purposes, so many of the engineering and legal expenses required to develop the property had already been paid. The land in the Townsend project was next to Thousand Oaks, a prestigious Peoria development. The per-acre value of petitioner's land in 1986 would also be lower because 1986 was a worse year for the economy than 1987. The following comparables in Mr. Spangler's and Mr. Klopfenstein's reports are 1986 sales in Peoria County, where the six tracts are located: Date of Sale
Location of Property
Price Per Acre
March 1986
Jubilee Township
$ 1,305
April 1986
Halleck Township
627
April 1986
Jubilee Township
575
July 1986
Medina Township
750
July 1986
Limestone Township
1,150
*133 Because we have decided that the highest and best use of the tracts at the valuation date was for agricultural purposes, in valuing the land we also looked at the percentage of it which was tillable. Generally, the greater the percentage of tillable land in an agricultural tract, the more valuable the tract. Notwithstanding our finding that the highest and best use of the property at the valuation date was for agricultural purposes, because certain tracts were potentially well suited for development of wooded river and valley view residential sites, and because the Peoria area economy was beginning to improve somewhat around that time, a buyer may have paid slightly more because of long-term speculative prospects for development. Thus, we have increased somewhat the value of the tracts. After considering all these factors, we value the six tracts of land, as of August 27, 1986, as follows: [SEE TABLE IN ORIGINAL]
(3) UNDIVIDED ONE-HALF INTEREST IN TRACTS I, II, AND III The partnership owned an undivided one-half interest in Tracts I, II, and III. The parties agree that the value of the partnership's interest in Tracts I, II, and III should be reduced by 50 percent. *134 Accordingly, our valuation of Tracts I, II, and III is reduced to $ 60,000, $ 60,000, and $ 14,000, respectively. The parties disagree, however, about whether the tracts should be discounted further because they were held as undivided interests. Petitioner argues that, because Illinois law requires a partition action to divide undivided interests in real property, the owner of an undivided interest who wished to sell the property would incur legal and appraisal expenses which would lower the value of the individual's interest. Respondent does not dispute this point. Mr. Klopfenstein, petitioner's witness, indicated that he believed the undivided interest in Tracts I, II, and III should be discounted by 25 percent. He based his opinion on discussions he has had over the past 10 years with auctioneers, farmers, and purchasers of agricultural land. Mr. Klopfenstein did not find any actual sales to corroborate his testimony. He believes that a person would acquire an undivided interest in land only at a discounted rate. Mr. Spangler, petitioner's other witness, did not testify concerning whether the partnership's undivided interest in these tracts should be discounted. Mr. Stone, *135 respondent's witness, believes the interest in Tracts I, II, and III should not be discounted. His report did not discuss whether the three tracts should be discounted on the grounds that they were an undivided interest. At trial, he said that there is no factual data to support a discount for undivided interests. He also testified that a person would probably not purchase an undivided half interest in this land because that person could not control the management of the land. His answer reflects the view that an undivided one-half interest is an impediment to selling the land, and it lends general support to petitioner's claim that the property should be valued for less because it is an undivided one-half interest. Courts generally will not apply a discount to property in which a taxpayer owns a fractional interest unless the taxpayer offers evidence that a partial interest in real property sells for less than its proportionate share of the entire value of the property. ; . In , the Court *136 found actual comparable sales of such property to be an example of such evidence. Actual sales of comparables, however, are not the only evidence which courts have accepted in deciding to grant a discount for partial interest in property. For example, in , the Court based its decision on the taxpayer's witness' testimony that it was common practice in the area real estate market to deduct a percentage on an individual fractional interest in appraising real estate and that it was difficult to find a buyer for an undivided fractional interest. In , the Court applied a 15-percent discount to an undivided one-half interest in real estate, based on the testimony of two appraisers. One of the appraisers estimated the value of the interest in question and the other made no specific estimate. We distinguish , in light of the evidence of record here. We conclude the partnership's one-half interest in Tracts I, II, and III *137 should be discounted by 15 percent because of the partnership's undivided interest. Accordingly, the partnership's interest in Tracts I, II, and III as of the valuation date is $ 51,000, $ 51,000, and $ 11,900, respectively. (4) VALUE OF DECEDENT'S INTERESTS IN THE TRACTS We next decide the value of petitioner's 57.13-percent interest in the partnership. To do this, we will adjust the value of the partnership's interest in the six tracts by certain assets and liabilities which are not in dispute, and multiply the total by 57.13 percent. 1.  Value of partnership's interest in  six tracts (reflects partnership's  undivided one-half interest in  Tracts I, II, and III).           $ 473,900
2.  Adjustment for certain assets and  liabilities not in dispute           321,719
3.  Net value of the partnership          795,619
4.  Value of petitioner's 57.13-percent  interest in the partnership          454,537
2. ADDITION TO TAX PURSUANT TO SECTION 6660 The second issue for decision is whether decedent's *138 Estate is liable for an addition to tax for an underpayment of estate tax attributable to a valuation understatement, pursuant to section 6660. Section 6660(a) [1] provides that in the case of an underpayment of a tax relating to estate and gift taxes which is attributable to a valuation understatement, there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. There is a valuation understatement if the value of any property claimed on any return is 66-2/3 percent or less of the amount determined to be the correct amount of such valuation. Sec. 6660(c). The section does not apply if the underpayment is less than $ 1,000 of the tax imposed with respect to the Estate of the decedent. Sec. 6660(d). The Secretary may waive all or any part of the addition to tax provided by section 6660 on a showing by the taxpayer that there was a reasonable basis for the valuation claimed on the return and that such claim was made in good faith. Sec. 6660(e). Respondent's refusal to grant a waiver of the section 6660 addition to tax is subject to judicial review, and the standard *139 we apply is whether there has been an abuse of discretion by respondent. See . Petitioner has the burden of proving that respondent abused his discretion. Rule 142(a); In light of our conclusion relating to the value of petitioner's interest in the partnership, we need not decide if respondent's failure to grant a waiver was an abuse of discretion. The value of decedent's interest in the partnership claimed on decedent's estate tax return, $ 364,551, is more than 66-2/3 percent of the amount which we have decided to be the correct amount of the valuation, $ 454,537. Accordingly, decedent's Estate is not liable for an addition to tax for an underpayment of estate tax attributable to a valuation understatement, pursuant to section 6660. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. These represent each appraiser's opinion of the value of the tracts. The figures do not take into account the fact that petitioner owned only 57.13 percent of the interest of the partnership which held the tracts or that the partnership owned only an undivided one-half interest in Tracts I, II, and III.↩
1. Sec. 6660(a) was repealed for returns due after Dec. 31, 1989.↩